No. 1909

Second Circuit

HUGH J. COYLE, ET AL. v. MRS. JESSIE BURTON, ET AL.

(October 21, 1925, Opinion and Decree)

(*Syllabus by the Editor*)

1. **Louisiana Digest—Abandonment—Par. 2.**

Where one who previously supposed herself to be the owner of land allows the fences to go down and built another one along another line between this line and the rest of the land after the discovery that, according to the records, the land belonged to the United States, these circumstances will show her intentions to abandon the land.

2. **Louisiana Digest—Abandonment—Par. 3.**

Under Article 3448 of the Civil Code, possession of land is lost with the consent of the former possessor when he does some act which manifests his intentions of abandoning possession.

3. **Louisiana Digest—Abandonment—Par. 3; Possession—Par. 7.**

Under Article 3449 of the Civil Code, the heirs of one who abandoned possession of property thereby lost their possession of it.

4. **Louisiana Digest—Prescription—Par. 20, 25.**

In order to acquire immovable property by the prescription of ten years under Articles 3478 and 3479 of the Civil Code, good faith on the part of the possessor, a just title, and ten years' possession are necessary.

5. **Louisiana Digest—Prescription—Par. 59.**

Good faith on the part of the possessor pleading prescription of ten years under Articles 3478 and 3479 of the Civil Code is shown by the fact that the property on all the accessible records belonged to the United States when the homestead entry was made and the defendant had advertised to prove up the homestead, to which the party contesting made no objection.

6. **Louisiana Digest—Prescription—Par. 34, 35, 37.**

In view of Articles 3442, 3443, 3444, 3492, 3487, 3437 and 3498 of the Civil Code, corporeal possession of immovables enjoyed under an application to the United States for title subsequently leading up to a title is a sufficient corporeal possession in the beginning to enable the party to complete prescription by civil possession.

Appeal from Second Judicial District Court of Louisiana, Parish of Webster. Hon. J. E. Reynolds, Judge.

This is a petitory action in which the plaintiffs seek to recover a tract of land for plaintiffs and defendants appealed.

Judgment reversed and the defendants quieted in the ownership and the possession of the land in controversy.

Drew & Drew, of Minden, attorneys for plaintiffs, appellees.

Stewart & Stewart, of Minden, attorneys for defendants, appellants.

CARVER, J. This is a petitory action in which the plaintiffs seek to recover a tract of land described as the northwest quarter of southwest quarter of Section 9, Township 23 North, Range 11 West.

Plaintiffs, except Coyle, claim the land by inheritance from George F. Brailey and his wife.

Coyle claims as purchaser from another one of the heirs.

Brailey bought the land in contest in 1886 and had actual possession until his death in 1888. The widow and heirs continued in possession for a time not definitely fixed but probably beyond 1896.

The deed by which Brailey acquired embraced the whole southwest quarter of Section 9 and the northeast quarter of northeast quarter of Section 17 which cornered with it. He, and his widow and heirs after his death, lived on the land in Section 9 but not on the "40" in dispute.

Under one fence were enclosed a part of the lands in dispute and a part of the rest of what Brailey bought.

A patent had issued from the United States government in 1861 to one Liverman covering the forty in dispute and also the east half of southwest quarter of Section 9, but this patent had remained in Washington and the Braileys seem not to have known of it prior to 1917.

In posting the Liverman entry on the tract book in the Natchitoches land office it was erroneously posted as covering east half of southwest quarter and northwest quarter of southeast quarter instead of east half of southwest quarter and northwest quarter of southwest quarter.

In the book of government entries on file in Webster parish—furnished, no doubt, by the register and receiver of the Natchitoches land office—the error made on the tract book was repeated, and it seems the same error was made on the tract book in the general land office at Washington.

By reason of this error the land in dispute appeared by the tract books at Natchitoches and Washington and the land entry book in Webster parish to be vacant public land of the United States.

Up to a time not definitely fixed in the testimony it had been generally recognized as belonging to the Braileys, but some time before 1899 its supposed vacant condition, as shown by the erroneous book entries became known, and in the spring of 1899 William Barnes began cultivation of the clearing on it and on April 12 of that year made formal application at the Natchitoches land office to enter it under the homestead law. He had bought what was probably a supposed settlement right from J. A. Smith, a half-brother of Mrs. Brailey, who had made some effort to homestead it. The testimony does not show the extent of this effort or the time at which it was made.

Barnes fenced about twelve acres of the forty, using some of the old rails remaining of a fence which had been allowed to go down, together with new rails made by himself, and made a crop on it that year. He died in the winter of 1899. He lived during that year in a little cabin that he thought was on the land. His widow remained in the house about a month after his death, when she moved away to Springhill, a distance of about three miles, to be near her relatives. In moving, she had no intention of abandoning her rights. She visited the place from time to time, tried to rent it, sold some timber from it to Bodcaw Lumber Company at a time not fixed by the testimony, and on October 14, 1901, sold a right of way over it to the Louisiana and Arkansas Railway Company.

On January 2, 1906, she submitted final proof on the homestead entry, receiving final certificate May 5, 1906, and a patent August 27, 1907. The patent was recorded in Webster parish March 27, 1915.

After moving away from the place she never cultivated it either herself or by any tenant, never lived on it, never paid taxes except, perhaps, for the year 1914 or 1915. Her visits to the place, efforts to rent it, selling the timber and granting the right of way to the railway company, were the only acts of dominion or possession performed by her from the time she moved away until she sold it to the defendant, Mrs. Burton, in 1915.

In making her final proof she and her witness testified that the cabin she and her husband had lived in though thought to be on the land was about twenty feet from the line and that her husband had not built any house on it except a corn crib which was then (January, 1906,) no

longer there, presumably having burned or rotted down.

The proof taken in this case leaves it somewhat uncertain whether the dwelling house was on or just off the land. This house was on or near the southeast corner. It seems there was also a little house on the northeast corner.

The testimony conclusively shows that the Braileys never had any possession and that Mrs. Brailey at least never intended to have any after the discovery was made that, according to the records in Webster parish, the land belonged to the United States. Mrs. Brailey permitted the fence to go down and built another one along what was supposed to be the line between this land and the rest of her land.

The testimony shows that the building of this line fence was a definite and deliberate yielding of possession to Barnes. Indeed, she had apparently abandoned possession before this, having left the fence go down on this land.

When Mrs. Burton was negotiating to buy from Mrs. Barnes, Mrs. Brailey showed her what was supposed to be the line between her land and the Barnes land, and said she was glad Mrs. Burton was going to buy the Barnes land.

Between the time Mrs. Brailey built the line fence in 1899 and the time she showed the supposed line to Mrs. Burton in 1915, and, indeed, until the steps taken in settling the succession of Mr. and Mrs. Brailey in 1919, the Braileys had no possession whatever and never made any claim to the land. They lived adjoining it and knew of Barnes' possessing it and claiming it and of Mrs. Barnes' proving it up, making no objection to any of this. Coyle says he considered the land vacant till he got a letter from the commissioner of the General Land Office, which was in 1917.

Thus we see that possession was lost from Mrs. Brailey to Barnes, if not indeed before that to Smith, by Mrs. Brailey's virtual consent. Civil Code, 3448, which reads as follows:

"Possession is lost with the consent of the possessor:

"1. When he transfers this possession to another with the intention to divest himself of it.

"2. When he does some act which manifests his intention of abandoning possession, as when a man throws into the street furniture or clothes, of which he no longer chooses to make use."

As to the other Braileys, if they did not consent to the abandonment they at least lost possession to Barnes under Civil Code, 3449, which reads as follows:

"A possessor of an estate loses the possession against his consent:

"1. When another expels him from it, whether by force in driving him away, or by usurping possession during his absence and preventing him from re-entering.

"2. When the possessor of an estate allows it to be usurped and held for a year, without, during that time, having done any act of possession, or interfered with the usurper's possession."

The abandonment or loss of possession, of course, could not divest the Braileys of their title, but it was an acknowledgment of Barnes' possession which might enable him or his successors in title to acquire by prescription.

The Brailey title had probably become perfect at the time they abandoned possession, so the crucial question is whether Mrs. Barnes thereafter acquired a title by the prescription of ten years. This prescription, of course, requires, Civil Code 3478 and 3479, good faith on the part of the possessor, a just title and ten years' possession.

Some effort is made to impugn the good faith of Mr. and Mrs. Barnes, but the testimony satisfies us that they were in good faith. It is true that for a long time previously the land had been generally recognized as belonging to the Braileys, but they had apparently abandoned their claim, it appearing on the accessible records as belonging to the United States, Smith having taken steps towards homesteading it and the Braileys' attitude seeming one of acquiescence in the situation as shown by those records. They knew of Mrs. Barnes' advertisement to prove up the homestead and made no objection. All this, we think, justified Mrs. Barnes in believing that she was acquiring the land from the true owner.

As to the title, of course, until Mrs. Barnes received the final certificate on May 5, 1906, she had no title but was merely an applicant for title.

During the year 1899 Barnes had actual, corporeal possession of about twelve acres. We have seen how and how little possession Mrs. Barnes enjoyed from the time she moved from the place until she sold it to Mrs. Burton in 1915. Since Mrs. Burton's purchase she has had actual, corporeal possession. Neither her possession nor her ownership was questioned until 1919 when in the settlement of the successions of Mr. and Mrs. Brailey the lands of the succession were advertised for sale, the advertisement including the tract in dispute. On seeing this advertisement Mrs. Burton brought a possessory action against the Braileys, alleging the advertisement and the contemplated sale as a disturbance of her possession, and on trial of that suit she obtained judgment quieting her in her possession.

It is clear that the possession enjoyed by Barnes in 1899 and by his widow for a month after his death was corporeal as to the part of the tract under fence and would have been sufficient to start the current of prescription of ten years if Barnes had had a title. After Mrs. Barnes moved away, it may be contended that she had no corporeal possession either before or after acquiring title on May 5, 1906, when the final certificate issued; but it is clear that she did have civil possession as defined by Civil Code, 3429:

"Possession is civil when a person ceases to reside in the house or on the land which he occupied, or ceases to detain the movable which he possessed, but without intending to abandon the possession."

Other articles of the Code provide that when a person has once acquired corporeal possession the mere intention thereafter to possess suffices to preserve the possession. (Civil Code, 3442.)

That the intention of retaining possession is presumed where a contrary intention does not decidedly appear. (Civil Code, 3443.)

That to thus retain possession, there need not be positive intention to do but mere negative intention suffices, the presumption being that the intention continues until revoked by a contrary intention. (Civil Code, 3444.)

That the actual possessor, when he proves that he has formerly been in possession, shall be presumed also to have been in possession in the intermediate time. (Civil Code, 3492.)

That in order to complete possession already begun, the civil possession shall suffice, provided it has been preceded by the corporeal possession. (Civil Code, 3487.)

That it is not necessary that a person wishing to take possession of an estate should pass over every part of it; it is sufficient if he enters on and occupies a part of the land, provided it be with the intention of possessing all that is included

within the boundaries. (Civil Code, 3437.)

That when a person has a title and possession conformably to it, he is presumed to possess according to the title and to the full extent of its limits. (Civil Code, 3498.)

Mrs. Burton's actual possession since her purchase, added to Mrs. Barnes' civil possession, amounts to more than ten years' possession under title, this suit having been instituted more than ten years from the time the patent was issued to Mrs. Barnes.

If this possession does not avail to complete the prescription, it can only be because there has been a lack of corporeal possession since acquisition of title, and because the corporeal possession enjoyed before that must be ignored for the reason that during its continuance Mrs. Barnes had no title but was only an applicant for title.

It seems to us, though, that this is too great a refinement and that the corporeal possession enjoyed under an application for title subsequently leading up to a title is a sufficient corporeal possession "in the beginning" to enable Mrs. Barnes to complete prescription by civil possession.

Beyond this, though, the operation of the railroad on the right of way Mrs. Barnes granted in 1901 was an enjoyment of corporeal possession of part of the land not, indeed, by Mrs. Barnes herself but by her authority. In a sense, the railroad company was her tenant, using the land of which the fee was in herself, she having only granted a right of way or passage over it. In this view she had corporeal possession all along since 1901.

For these reasons it is decreed that the judgment of the lower court be reversed, that the demands of the plaintiffs be rejected, and that defendants, Mrs. Jessie Burton and husband, be quieted in the ownership and possession of the land in controversy.

REYNOLDS, J., recused.